# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JODI M. IVERSON,**

    **Plaintiff,**

    **v.**                            **Case No. 24-CV-135-SCD**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

---

## DECISION AND ORDER

---

Jodi Iverson applied for social security benefits after injuring her back while working as a sorter at Amazon. While her claim was pending, she underwent two separate fusion surgeries on her lumbar and cervical spine. An administrative law judge nevertheless denied her claim for benefits, finding that Iverson could still perform her previous clerical-type work.

Iverson seeks judicial review of the ALJ's decision, arguing that the ALJ improperly relied on outdated state-agency findings and erred in assessing the medical opinions of the orthopedic spine specialist who performed her surgeries. Because the record does not contain any new, significant evidence that reasonably could have changed the state-agency findings, the ALJ did not need to consult a medical expert, and those older assessments still constitute substantial evidence supporting the ALJ's decision. Moreover, the ALJ reasonably determined that the surgeon's more extreme opinions were unsupported and inconsistent with other evidence in the record. And the ALJ explicitly considered and reasonably accommodated Iverson's post-surgery symptoms. Accordingly, I will affirm the denial of disability benefits.

# BACKGROUND

Iverson was born in November 1972. *See* R. 24, 182.[1] After completing her GED, she worked for many years without issue, primarily performing clerical or administrative duties. *See* R. 201, 299–301. In 2020, Iverson crossed over to being a sorter at Amazon. R. 187, 213–14, 286, 300. The job required her to scan heavy boxes, lift the boxes onto loading pallets, and push the pallets with a pallet jack. R. 300, 376. The repetitive movement took a toll on her, and in July 2020 Iverson began feeling pain in her neck that radiated down her left side. R. 286, 346–55, 1548, 1831. Diagnostic imaging revealed moderate degenerative disk changes, disk extrusions, and stenosis in Iverson's cervical spine. R. 326, 426–28. She received several epidural steroid injections, which provided temporary relief. R. 336, 358, 1548.

In November 2021, Iverson injured her back while working at Amazon. *See* R. 1192, 1732, 1831. She was trying to shake out a stuck pallet jack when she felt a sharp pain in her lower back. Iverson reported the incident to her supervisor, but she didn't immediately seek medical attention because she took a leave of absence to care for her dying mother. In early January 2022, Iverson went to urgent care complaining about increased back pain. R. 1831–36. She attempted to return to work a few days later; however, she had a recurrence of pain and was excused from work with temporary restrictions.

In May 2022, Iverson had an initial consultation with Branko Prpa, an orthopedic spine specialist. *See* R. 375–78. Iverson told Dr. Prpa that her lower back pain caused difficulty walking and lifting. Dr. Prpa diagnosed lumbar radiculopathy, provided work restrictions, and referred Iverson for bilateral facet injections.

---

[1] The transcript is filed on the docket at ECF No. 25-1.

Iverson continued to experience radiating neck and back pain throughout 2022. Diagnostic imaging revealed broad-based disk herniations and degenerative changes in her cervical and lumbar spine. *See* R. 387–88, 393, 397–404. After injections and radiofrequency ablation provided little relief, Dr. Prpa recommended two-level cervical fusion surgery and single-level lumbar fusion surgery. *See* R. 390–92, 405–06, 691.

In August 2022, Iverson applied for disability insurance benefits under Title II of the Social Security Act. *See* R. 13, 60–61, 182–83, 199–207. She alleged that she became disabled when she injured her back at work in November 2021 and noted that she was scheduled for back surgery. At the time of the application, Iverson was working at Amazon with light-duty restrictions. She claimed that her back issues limited her ability to perform her normal work duties. *See* R. 234–41.

On October 20, 2022, Iverson underwent L4-L5 fusion and decompression surgery. *See* R. 710–13. She was discharged from the hospital two days later. At her first post-op visit, Iverson stated that she was doing well, she was starting to wean off her narcotic pain medication, and she was ambulating regularly. R. 963. A physical exam revealed intact strength and sensation in Iverson's lower extremities, and her wound was healing without complications.

In November 2022, the state agency charged with reviewing disability applications on behalf of the Social Security Administration denied Iverson's claim. *See* R. 60–70. Marc Young, MD, reviewed the available medical records—including from the first post-op visit—and found that Iverson could perform light exertional work.[2] As support, Dr. Young explained

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

3

that Iverson appeared to be doing well following her lumbar fusion surgery.

Iverson continued to follow up with Dr. Prpa. In December 2022, she told Dr. Prpa that she still had occasional numbness, she had been walking tremendously, and she stopped using her brace. R. 962. Iverson's biggest complaint, however, was neck pain that radiated primarily in her left upper extremity. A physical examination revealed some weakness in Iverson's left arm, restricted range of motion in all planes, and signs of cervical radiculopathy. An MRI showed three-level disk involvement in Iverson's cervical spine with large disk herniations and significant left foraminal stenosis. Dr. Prpa referred Iverson for an electromyography exam, which surprisingly (according to Dr. Prpa) was negative for nerve involvement. *See* R. 962, 964–65, 1223. Nevertheless, Dr. Prpa recommended cervical anterior fusion surgery.

On February 15, 2023, Iverson underwent C4-C7 anterior cervical diskectomy and fusion. *See* R. 1224–28. She was discharged from the hospital the following day with her strength, sensation, and reflexes intact. At her first cervical post-op visit, Iverson stated that she was doing "very, very well," that her arm pain was gone, that she was sleeping well at night, and that she had no complaints. R. 1427, 1429. A physical exam revealed intact bilateral upper extremity strength and sensation, and her wound was healing without issue.

Meanwhile, Iverson requested reconsideration of the state agency's disability denial. *See* R. 96, 252–58, 260–67. She alleged that she was unable to work while recovering from the two spinal surgeries. Iverson reported being able to manage her personal care, make simple meals, and wash dishes. However, she said she needed help doing laundry and grocery shopping and indicated that her husband had to take care of their animals, cook, and perform

4

all outside chores. Iverson asserted that, while in recovery, she had a ten-pound lifting restriction, and she could sit and stand for only short periods of time.

In late March or early April 2023,[3] Dr. Prpa completed a musculoskeletal questionnaire in support of Iverson's disability application. *See* R. 1538–43. Dr. Prpa diagnosed cervical spondylosis with disk herniation, cervical radiculopathy, and lumbar radiculopathy that caused neck and arm pain and numbness and tingling in the lumbar spine. Dr. Prpa indicated that Iverson had reduced range of motion, sensation, and reflexes and that she needed to be out of work for about twelve weeks.

In April 2023, the state agency denied Iverson's request for reconsideration. *See* R. 71– 85. Mina Khorshidi, MD, reviewed the updated medical records, including the visit six weeks out from the lumbar fusion, the first cervical post-op visit, and Dr. Prpa's musculoskeletal questionnaire. Dr. Khorshidi found that Iverson could perform light exertional work with only frequent stooping and only frequent overhead reaching bilaterally.[4] As support, Dr. Khorshidi explained that Iverson seemed to be healing well after her lumbar and cervical fusion surgeries and that she was expected to be capable of sustaining light work at the one-year post-surgery mark.

In June 2023, Iverson started physical therapy for her neck and back. *See* R. 45, 286. During a session in mid-July, a new therapist applied too much pressure on Iverson's neck. *See* R. 1649. That night, Iverson felt severe dizziness when she lay down, and she vomited. Iverson went to the ER after the dizziness persisted for several days. At a follow-up visit the

---

[3] Although Dr. Prpa signed the questionnaire on March 31, 2023, the form indicates that Iverson's most recent exam was on April 4, 2023. It appears, however, that the April treatment note is not in the record.

[4] "'Frequent' means occurring from one-third to two-thirds of the time." Social Security Ruling (SSR) 83-10, Titles II and XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2, 1983 WL 31251, 1983 SSR LEXIS 30, at *14 (Jan. 1, 1983).

5

next day with her primary care provider, Iverson exhibited tenderness and very mild stiffness in her neck but normal range of motion. R. 1648–58. The provider assessed neck pain, cervicalgia, and cervical spine osteoarthritis and recommended that Iverson apply ice and heating pads, do stretching exercises, and hold off on physical therapy. The provider also called Dr. Prpa's office so that he was aware about the "severe complications" from physical therapy. R. 1654.

In August 2023, Dr. Prpa completed a medical source statement about Iverson's ability to do work-related activities *See* R. 1631–36. Dr. Prpa opined that Iverson could never lift or carry any amount of weight; could sit, stand, and walk, respectively, for one hour at a time and four hours in an eight-hour day; could only occasionally reach and push or pull; could only occasionally balance, stoop, and climb stairs and ramps; could never kneel, crouch, crawl, or climb ladders or scaffolds; could never work with vibration (among other environmental limitations); and was unable to walk a block at a reasonable pace on rough or uneven surfaces.[5] As support for his opined manipulative limitations, Dr. Prpa cited Iverson's cervical fusion surgery. He indicated that Iverson's limitations had lasted or were expected to last for twelve consecutive months.

After completing her treatment with Dr. Prpa, Iverson was referred to Joseph Reyes, a pain management specialist. *See* R. 286. At her first visit with Dr. Reyes in August 2023, Iverson stated that she had moderate to severe lower back pain that caused decreased mobility, loss of balance, and weakness. R. 1841–45. She also said that climbing stairs, bending, changing positions, driving, sitting, lifting, movement, and the weather aggravated her

---

[5] "'Occasionally' means occurring from very little up to one-third of the time." SSR 83-10, 1983 SSR LEXIS 30, at *13.

6

symptoms. A physical exam revealed limited range of motion in her cervical and lumbar spine, normal motor strength, pain with extension in the lumbar spine, and paraspinal tenderness. Dr. Reyes diagnosed cervicalgia, lumbar spondylosis, and lumbar degenerative disk disease and said he'd review Iverson's most recent imaging studies to see if she was a candidate for medical branch blocks and radiofrequency ablation. Iverson returned to Dr. Reyes a few weeks later continuing to complain about moderate lower back pain. *See* R. 1850–55. She exhibited tenderness with palpation over the lumbar spine and the bilateral sacroiliac joints and mild pain with lumbar flexion and extension. Dr. Reyes assessed post-laminectomy syndrome and lumbar spondylosis. In October 2023, Dr. Reyes administered bilateral medial branch blocks and radiofrequency ablation. *See* R. 1852, 1858, 1863–66. Iverson reported that the injections relieved 86% of her pain, but the relief lasted for only four hours.

In November 2023, Iverson had a hearing before an ALJ. *See* R. 31–59. Iverson's lawyer amended the alleged onset of disability date to October 20, 2022—the date of Iverson's lumbar fusion surgery. R. 36–38. Iverson testified that she developed back and neck issues while working at Amazon. R. 43–44. She said she still had symptoms (especially in her lower back) despite the two fusion surgeries, physical therapy, and medial branch blocks, which she said provided only temporary relief. R. 44–47. Iverson indicated that she could sit for thirty minutes before needing to change positions, she needed to frequently lie down throughout the day, and she could stand for thirty or forty minutes before needing to sit or lie down. R. 47–49. As for her daily activities, Iverson said she could perform light household chores like vacuuming and laundry but that her husband needed to carry the laundry basket and bring in groceries, which she had delivered. R. 49. Iverson also said that, while she could do her daily tasks most days, at times she got very winded or her activities exacerbated her pain symptoms

7

and she needed to lie down and rest. She stated that she was able to drive to her doctor appointments, which were about twenty minutes from her house. R. 49–50.

On November 21, 2023, the ALJ issued a written decision finding that Iverson was not disabled. *See* R. 10–30. The ALJ considered the disability application under 20 C.F.R. § 404.1520, which sets forth a five-step process for evaluating DIB claims. *See* R. 13–25. At step one, the ALJ determined that Iverson had not engaged in substantial gainful activity since her alleged onset of disability. R. 15. The ALJ determined at step two that Iverson had one severe impairment: degenerative disk disease of the cervical and lumbar spine. R. 15–17. At step three, the ALJ determined that Iverson did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in the social security regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 17.

Prior to step four, the ALJ assessed Iverson's residual functional capacity—that is, the most she could do despite her physical and mental limitations, *see* 20 C.F.R. § 404.1545(a). The ALJ determined that Iverson could perform light work with several exertional, manipulative, postural, and environmental limitations: occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; sit, stand, and walk, respectively, for six hours; frequent reaching overhead bilaterally; occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; no work at unprotected heights; and only occasional work with vibration. R. 17.

In assessing that RFC, the ALJ considered the objective medical evidence, Iverson's subjective allegations, and the medical opinion evidence. *See* R. 17–23. The ALJ noted that Iverson first showed signs of neck and back issues in 2020, and he discussed the medical

8

evidence leading up to Iverson's lumbar fusion surgery in October 2022. *See* R. 18–19. The ALJ also discussed the lumbar post-op medical records preceding Iverson's cervical fusion surgery in February 2023. *See* R. 19–20. Finally, the ALJ discussed the cervical fusion and post-op medical records, including the March 2023 visit when Iverson reported doing very well and not having any arm pain; the July 2023 bout of dizziness and neck pain; and pain management records from August, September, and October 2023 where Iverson complained of ongoing back and neck pain and exhibited limited range of motion and tenderness during physical exams. R. 19–21.

As for the subjective allegations, the ALJ determined that Iverson's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, according to the ALJ, Iverson's statements about the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the evidence in the record. R. 18, 21. The ALJ concluded that, despite ongoing complaints of back and neck pain and exams showing reduced range of motion, Iverson appeared to be doing well following her fusion surgeries. R. 21. The ALJ noted that there was no indication further surgery was necessary and that her post-op treatment remained conservative in nature with medications and injections, which Iverson reported were 80% effective at managing her symptoms. The ALJ also concluded that Iverson could perform most activities of daily living, including light household chores, personal care tasks, taking her medicine, preparing simple meals, driving a car, shopping by computer, attending doctor appointments, managing finances, and conversing with others.

The ALJ also considered the opinion evidence. *See* R. 22–23. The ALJ found most of the opined limitations in Dr. Prpa's August 2023 medical source statement unpersuasive

9

because they were not well-supported or consistent with the overall record. Specifically, the ALJ rejected Dr. Prpa's opinions that Iverson could never lift or carry, could only occasionally reach overhead, could only occasionally push or pull, could never work with vibration, and could only frequently operate a motor vehicle. According to the ALJ, those "extreme" findings were inconsistent with post-surgery imaging showing no complications or hardware compromise, post-surgery records where Iverson reported doing well, Iverson's statements that injections were 80% effective, and recent pain management records showing only conservative treatment. R. 22.

The ALJ found that Dr. Prpa's more extreme opinions were also inconsistent with the state-agency reviewing physicians' findings and Iverson's claimed daily activity level. R. 22. According to the ALJ, Dr. Young and Dr. Khorshidi supported their findings with good explanation based on a review of the available evidence. R. 22–23. The ALJ further concluded that the reviewing physicians' findings were consistent with the treating and specialty records, post-surgery diagnostic results, Iverson's statements to providers, and Iverson's reported activities. The ALJ explained that he accommodated Iverson's ongoing pain and weakness by including additional postural, environmental, and manipulative limitations in the RFC assessment that were not assessed by Dr. Young or Dr. Khorshidi. R. 23.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Iverson could still perform her past relevant work as a credit card clerk, an accounts payable clerk, and a credit card control clerk. R. 23–24. The ALJ determined at step five that Iverson could also work as an inspector/packager, a price marker, and a cashier. R. 24–25. Based on those findings, the ALJ determined that Iverson was not disabled at any time from her amended alleged onset date through the date of the decision. R. 25.

10

The Social Security Administration's Appeals Council subsequently denied Iverson's request for review, R. 4–9, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)).

In January 2024, Iverson filed this action seeking judicial review of the Commissioner's decision denying her claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* Compl., ECF No. 1. The matter was reassigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 4, 5. Iverson filed a brief in support of her disability claim, ECF No. 14; the Commissioner filed a brief in support of the ALJ's decision, ECF No. 21; and Iverson filed a reply brief, ECF No. 24.

## LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019)). "When reviewing the

11

record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Iverson seeks remand for a rehearing, arguing that the ALJ erred in assessing her RFC. Her main argument is that the ALJ committed reversible error when he relied on the outdated findings of the state-agency reviewing physicians. According to Iverson, Dr. Young and Dr. Khorshidi suggested that Iverson was well on the road to recovery following her lumbar fusion surgery in October 2022 and her cervical fusion surgery in February 2023. However, Iverson says that the reviewing physicians did not have the benefit of the latest medical records showing a resurgence of Iverson's neck and arm pain. Iverson insists that the ALJ was not qualified to make his own determination on the significance and functional impact of those latest developments, and she criticizes the ALJ for not obtaining an updated expert medical opinion and for disregarding several opinions from Dr. Prpa, the orthopedic spine specialist who performed the surgeries.

At the hearing level, the ALJ is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546(c). The ALJ must consider all the relevant evidence in the record, including the prior administrative medical findings of state-agency medical consultants. *See* 20 C.F.R. §§ 404.1513a(b), 404.1545. The ALJ also can ask for medical evidence from an expert. *See* 20

12

C.F.R. § 404.1513a(b)(2). Although the decision to consult an expert is discretionary, "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)). "But older assessments can still constitute 'substantial evidence' supporting the ALJ's decision where the new tests do not 'necessarily undermine [previous medical] conclusions.'" *Bakke v. Kijakazi*, 62 F.4th 1061, 1067 (7th Cir. 2023) (quoting *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021)).

Iverson points to three pieces of "new" evidence that she says undermine the reviewing physicians' findings: (I) the musculoskeletal questionnaire that Dr. Prpa completed in late March or early April 2023; (II) Iverson's exacerbation of neck pain in July 2023; and (III) Dr. Prpa's August 2023 medical source statement.

## I. Dr. Prpa's Musculoskeletal Questionnaire

In the musculoskeletal questionnaire, Dr. Prpa indicated that Iverson had increased neck and arm pain; had reduced range of motion, sensation, and reflexes in her cervical and lumbar spine; and needed to be off work at least twelve weeks. *See* R. 1538–42. Although the questionnaire was not available to Dr. Young, *see* R. 61–70, Dr. Khorshidi explicitly considered it in her assessment and found that Iverson could perform more strenuous work than the ALJ ultimately assessed, *see* R. 72–85. Thus, the musculoskeletal questionnaire does not constitute "new" evidence that reasonably could have changed Dr. Khorshidi's findings.

Iverson criticizes the ALJ for not mentioning the musculoskeletal questionnaire in his decision. "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580

F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). The ALJ in our case did not discuss the questionnaire. But he did explicitly consider and explain why he rejected similar temporary work restrictions from Dr. Prpa. *See* R. 22 (citing Exhibits 5F; 11F/25–40; 13F/17–27; 21F/12; 23F/13–14; 28F). And he considered other treatment records that identified similar symptoms and exam findings. For example, the ALJ noted that Iverson complained of neck pain and exhibited tenderness and very mild stiffness during a visit with her primary care provider in July 2023. R. 20 (citing Exhibit 31F/8–14). The ALJ also discussed Iverson's recent pain management records, which documented neck and lower back pain, limited range of motion in the cervical and lumbar spine, lumbar tenderness, and lumbar pain with flexion and extension. R. 20–21 (citing Exhibits 32F; 34F; 35F/3; 36F/3–4). Thus, the ALJ did not ignore an entire line of evidence that was contrary to the reviewing physicians' findings.

## II.     Iverson's Exacerbation of Neck Pain

In July 2023, Iverson went to the ER after experiencing severe dizziness and vomiting following a physical therapy session. *See* R. 1649. She followed up with her primary care provider the next day, and during that visit, Iverson complained about neck pain and exhibited tenderness and very mild stiffness in her neck. *See* R. 1648–58. The provider assessed neck pain, cervicalgia, and cervical spine osteoarthritis and recommended that Iverson apply ice and heating pads, do stretching exercises, and hold off on physical therapy. The provider also called Dr. Prpa's office so that he was aware about the "severe complications" from physical therapy. R. 1654.

It is undisputed that the state-agency reviewing physicians were unaware of Iverson's exacerbation of neck pain following her cervical fusion surgery. Dr. Young issued his findings

in November 2022—months before Iverson even had that surgery. Dr. Khorshidi issued her findings in April 2023—several weeks after Iverson said she was doing "very, very well" and that her arm pain was gone. The exacerbation occurred in July 2023.

Nevertheless, Iverson's cervical spine impairment was not "new," and the July 2023 findings were not of the type that require medical scrutiny. Both Dr. Young and Dr. Khorshidi reviewed evidence relating to Iverson's cervical spine issues. *See* R. 62–63, 67–68, 74–75, 80–81. Although the July 2023 primary care visit post-dated that review, Iverson concedes that the ALJ discussed that visit in his decision. *See* Pl.'s Br. 17. The ALJ noted that Iverson complained of intermittent dizziness and neck pain after completing aggressive physical therapy for her back/neck. R. 20 (citing Exhibit 31F/8–14). The ALJ also noted the physical exam results, the provider's assessments, and the recommended treatment. Unlike with MRI results or other complex medical tests, the ALJ did not need to consult a medical expert to analyze the impact of a routine musculoskeletal exam showing neck tenderness and stiffness. *Cf. Goins*, 764 F.3d at 680 (finding an ALJ erred when he uncritically accepted reviewing physicians' assessments despite a new and potentially decisive MRI); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("The cases in which we have reversed because an ALJ impermissibly 'played doctor' are ones in which the ALJ failed to address relevant evidence.") (citations omitted).

Moreover, there is nothing in the record suggesting that Iverson's exacerbation of neck pain was a material change that merited submission to a consulting physician. Iverson faults the ALJ for not specifically mentioning that her provider characterized her complications from physical therapy as "severe." But the ALJ did not need to mention every detail of that medical record. *See Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021) ("True, the ALJ's

15

summary does not mention every detail. But it need not.") (citation omitted). Indeed, the treatment notes imply that Iverson's increased neck pain was a temporary exacerbation at the hands of an over-aggressive therapist. *See* R. 1649 (noting that Iverson's symptoms began when a new therapist—apparently she had several different ones following the cervical fusion surgery—applied too much pressure on her neck); *see also* R. 45 (Iverson testifying that she started physical therapy in June 2023—about two months before the exacerbation). Iverson also seems to believe that Dr. Prpa issued his permanent restrictions *in response to* the exacerbation of neck pain. *See* Pl.'s Reply 3. However, she presents no evidence to support that belief. The record suggests that Iverson's last visit with Dr. Prpa was in April 2023. *See* R. 1538, 1594. There is no evidence that he examined Iverson after her exacerbation of neck pain, and he didn't mention the exacerbation in his medical source statement, *see* R. 1631–36. After Iverson completed her treatment with Dr. Prpa, she was referred to Dr. Reyes for pain management. But those records reflect that Iverson's primary complaint was lower back pain, not neck pain *See* R. 1841–66.

In sum, the July 2023 primary care visit did not turn up new, significant findings that reasonably could have changed the state-agency reviewing physicians' findings.

## III. Dr. Prpa's Medical Source Statement

In August 2023, Dr. Prpa completed a medical source statement opining (among other things) that Iverson could never lift or carry any amount of weight; could sit, stand, and walk, respectively, for one hour at a time and four hours a day; could only occasionally reach and push or pull; could never work with vibration; and could only frequently operate a motor vehicle. *See* R. 1631–36. Dr. Prpa's medical source statement post-dated the state agency review. The ALJ, however, considered the statement and declined to adopt Dr. Prpa's opined

16

limitations, finding his "extreme" findings not well-supported and inconsistent with the evidence as a whole. R. 22. Iverson argues that the ALJ failed to provide a well-reasoned explanation for dismissing Dr. Prpa's opinions.

Because Iverson applied for social security benefits after March 27, 2017, Dr. Prpa's opinions are not entitled to controlling weight. *See* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources."). Rather, the ALJ had to consider the persuasiveness of Dr. Prpa's opinions using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a prior administrative medical finding. *See* 20 C.F.R. § 404.1520c(c). Although an ALJ may consider all five factors, "the most important factors" are supportability and consistency. 20 C.F.R. § 404.1520c(a), (b)(2).

The ALJ reasonably determined that Dr. Prpa's more extreme opinions were not well-supported. The supportability factor focuses on what the source brought forth to support his findings. *See* 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . .will be."). Dr. Prpa's medical source statement was largely a check-the-box form. When asked to identify the medical or clinical findings that supported his opined manipulative limitations, Dr. Prpa cited Iverson's cervical fusion surgery. R. 1633. The ALJ acknowledged that Dr. Prpa's opinion was based on that surgery. R. 22. However, Dr. Prpa did not explain why he believed Iverson would not make a full recovery. He did not, for example, cite any medical findings showing complications from surgery or concerns with the healing process. Nor did Dr. Prpa cite any

17

findings in support of his other opined limitations. *See* R. 1631–36. The ALJ therefore sufficiently articulated why the supportability factor rendered Dr. Prpa's opinions unpersuasive.

The ALJ also reasonably determined that Dr. Prpa's more extreme opinions were inconsistent with other evidence in the record. The consistency factor compares the source's findings to evidence from other sources. *See* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."). The ALJ provided several examples of inconsistencies. *See* R. 22 (citing Exhibits 10F; 13F; 19F; 22F; 27F; 31F; 34F; 2A; 4A). Post-surgery imaging did not reveal any complications or hardware compromise. R. 966, 1229, 1427–29. During her first cervical post-op visit, Iverson reported doing "very, very well," said that her arm pain was gone and that she was sleeping well at night, and didn't have any complaints. R. 1427. Iverson testified at the administrative hearing that the medical branch blocks temporarily relieved 80% of her symptoms. R. 46–47. And, according to the ALJ, recent pain management records showed only conservative treatment for Iverson's ongoing pain issues and weakness. R. 1841–66. The ALJ found that Dr. Prpa's opinions were also inconsistent with the state-agency reviewing physicians' assessments that Iverson was generally capable of light exertional work, R. 61–70, 72–85, and were inconsistent with Iverson's daily activities, including driving, doing chores, preparing meals, and walking, *see* R. 47–50, 234–41, 260–67.

As the Commissioner aptly points out, Iverson's challenges to the ALJ's evaluation of Dr. Prpa's opinions largely amount to disagreement with how the ALJ weighed the evidence, which is not grounds for remand. *See Gedatus*, 994 F.3d at 900 ("We will not reweigh the

18

evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it.") (citations omitted). Iverson first argues that the ALJ ignored an entire line of evidence that suggested her condition significantly worsened following her cervical spine fusion, including the "severe" complications following physical therapy in July 2023 and the musculoskeletal questionnaire documenting neck and arm pain, reduced range of motion in the upper extremity joint and the cervical spine, and diminished sensation and reflexes of the upper extremities. As explained above, however, the ALJ noted Iverson's exacerbation of neck pain in July 2023 and mentioned several post-op records showing musculoskeletal deficiencies. *See* R. 20–21. Moreover, given that subsequent treatment focused primarily on Iverson's ongoing lower back pain, *see* R. 1841–66, it's far from clear that the neck pain was a significant development and not a minor setback.

Iverson also takes issue with the ALJ's characterization of her treatment as conservative. She accuses the ALJ of minimizing the invasiveness of her two fusion surgeries. However, the ALJ clearly was referring to Iverson's *post-surgery* treatment. The ALJ noted that, while Iverson continued to complain about neck and lower back pain and recent pain management records showed decreased range of motion, there was no indication that Iverson was a candidate for additional surgery, and her post-op treatment consisted of medications and injections. R. 21 (citing Exhibits 32F; 34F). Those treatment methods have been described as "conservative" by other courts. *See, e.g.*, *Kolar v. Colvin*, No. 13 CV 6011, 2016 WL 397288, 2016 U.S. Dist. LEXIS 12362, at *26–28 (N.D. Ill. Feb. 2, 2016) (collecting cases). And Iverson presents no evidence suggesting that pain management is outside the ordinary course for an individual still recovering from back and neck surgery. Indeed, there is no evidence in the

19

record suggesting that Iverson was referred to pain management because of worsening neck symptoms. And Iverson's primary care provider recommended that she treat her neck pain with ice, heating pads, and stretching. R. 1654.

Finally, Iverson argues that the ALJ failed to consider the context of her reported activities and did not explain how the activities he mentioned were inconsistent with Dr. Prpa's opined limitations. For example, Iverson says she needed assistance from her husband to lift a laundry basket and carry in groceries, she could do only light household chores for thirty minutes before needing to stop and rest, and she drove only twenty minutes to her doctor appointments. But even the minimal activities Iverson described are clearly inconsistent with Dr. Prpa's opinion that Iverson could never lift or carry any weight. Also, Iverson's alleged daily activity level was merely one of several inconsistencies the ALJ identified; he didn't not overly rely on that single factor.

In sum, the ALJ reasonably evaluated Dr. Prpa's medical source statement, and substantial evidence supports the ALJ's determination that Dr. Prpa's more extreme findings were unsupported and inconsistent with other evidence in the record.

\*     \*     \*

The three pieces of evidence identified by Iverson do not necessarily undermine the state-agency reviewing physicians' findings. Dr. Khorshidi explicitly considered the musculoskeletal questionnaire, Iverson's exacerbation of neck pain was not a material change in her condition, and the ALJ reasonably rejected Dr. Prpa's more extreme opinions. Because the record does not contain any new, significant evidence that reasonably could have changed the state-agency findings, the ALJ did not need to consult a medical expert, and those older assessments still constitute substantial evidence supporting the ALJ's decision.

20

Moreover, the ALJ did not ignore Iverson's ongoing symptoms. He discussed evidence of post-surgery pain and weakness and accommodated those symptoms by including in the RFC assessment additional limitations not assessed by the reviewing physicians. Although Iverson wishes the ALJ had weighed that evidence differently, a reasonable mind could accept the ALJ's conclusion that Iverson could still work notwithstanding her ongoing symptoms.

## CONCLUSION

For all the foregoing reasons, I find that substantial evidence supports the ALJ's decision and that Iverson has not demonstrated that the ALJ committed reversible error in denying her disability claim. I therefore **AFFIRM** the Commissioner's decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 31st day of January, 2025.

STEPHEN C. DRIES
United States Magistrate Judge